# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    **X**

**ADVANCED VIDEO TECHNOLOGIES LLC,**    **:**

     **Plaintiff,**    **:**    **Case No. 1:11-cv-8908 (CM)**

     **vs.**    **:**

**RESEARCH IN MOTION LTD., and**    **:**
**RESEARCH IN MOTION CORPORATION**

     **:**

     **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    **X**

## RESEARCH IN MOTION LTD. AND RESEARCH IN MOTION CORPORATION'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

                                                                                        Page

I.      INTRODUCTION ....................................................................................1

II.     DISPUTED CLAIM TERMS .................................................................2

        A.    "dedicated hardware logic" (Claims 5, 13, 23)............................2

        B.    "interim storage of incoming ... video data" (Claims 5, 13, and 26)................6

        C.    "video input data" (Claims 5, 13, 26) ..................................8

        D.    "interim storage of...outgoing video data" (Claims 5, 13, 23, 26) ...................9

        E.    "quantization" (Claim 5, 13, 23, 26) ...................................11

        F.    "video compressor/decompressor disposed fully within the chip" (Claims 5, 13, 23, 26)...................12

        G.    "video input connection" and "a video input connection from a camera" (Claims 5, 13, 26)...................13

        H.    "video information received from said [or the] video input connection" and "video input data from the video input connection" (Claims 5, 13, 26)..........15

III.    CONCLUSION...............................................................................16

# TABLE OF AUTHORITIES

Federal Cases

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007)................................................................. 5

*AFG Indus., Inc. v. Cardinal IG Co.*,
    375 F.3d 1367 (Fed. Cir. 2004)............................................................... 16

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011)................................................................. 1

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)............................................................... 16

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)................................................................. 5

*Cordis Corp. v. Boston Scientific Corp.*,
    658 F.3d 1347 (Fed. Cir. 2011)........................................................... 1, 15

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009)............................................................... 10

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
    1:CV-09-1685, 2010 WL 3896206 (M.D. Pa. Sept. 30, 2010)............... 16

*Krippelz v. Ford Motor Co.*,
    667 F.3d 1261 (Fed. Cir. 2012)..................................................... 1, 3, 9, 15

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)........................................................ 1, 5, 9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................. 4

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985)........................................................ 7, 9, 15

Federal Statutes

35 U.S.C. § 112(1) ..................................................................................... 10

Defendants Research In Motion Ltd. and Research In Motion Corp. (collectively, "RIM") respectfully submit this responsive brief regarding construction of the disputed terms in U.S. Patent No. 5,781,788 C1 (the '788 patent).

## I.   INTRODUCTION

As explained in RIM's opening brief (Dkt. No. 27, Research In Motion Ltd. And Research In Motion Corporation's Opening Claim Construction Brief ("RIM Opening Br.")), the claims of the '788 patent were narrowed significantly in the original prosecution and again during reexamination.  Both the original Applicants and AVT made representations that the Patent Office relied upon in allowing the claims; such representations are binding, and limit the scope of the '788 patent.

AVT's proposed constructions, however, ignore these limitations.  AVT disregards relevant prosecution and reexamination history, or misapplies that evidence to advance a broader construction than is allowed under patent law.  *See, e.g.*, *Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011) ("[a]rguments made during the prosecution of a patent application are given the same weight as claim amendments"); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) (citing *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011), for the proposition that "[a] patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer"); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.").

RIM's proposed constructions properly weigh and apply the relevant intrinsic evidence. Accordingly, RIM respectfully requests that the Court adopt its proposed constructions.

## II. DISPUTED CLAIM TERMS

### A. "dedicated hardware logic" (Claims 5, 13, 23)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "dedicated hardware logic" | "integrated circuitry for performing specific tasks (e.g., DCT/IDCT), as opposed to a general-purpose processor" | "specific integrated circuitry or circuit elements for the purpose of performing video compression and decompression" |

The parties dispute whether "dedicated hardware logic" may include circuitry within a general-purpose processor that may perform additional functions (AVT), or whether the term is limited to circuitry for performing specific functions (RIM). The relevant prosecution history, which AVT fails to address, and even the extrinsic evidence cited by AVT support RIM's proposed construction, not AVT's. For at least these reasons, AVT's construction should be rejected.

The phrase "dedicated hardware logic" was added during the reexamination of the '788 patent for the explicit purpose of avoiding the Bose and Shimoda prior art references, a fact that AVT ignores altogether in its briefing. (*See* RIM Opening Br. at 5-7; Mehta Ex. B at 13;[1] *see also* AVT Opening Br. at 22 ("the specification does not use the complete phrase 'dedicated hardware logic'")).[2] As explained in RIM's opening brief, claims 5, 13 and 23 were amended to

---

[1] Citations to "Mehta Ex. __" refer to exhibits to the Declaration of Erin Greenfield Mehta in Support of Research In Motion Ltd. and Research In Motion Corporation's Opening Claim Construction Brief (Dkt. No. 28).

[2] Citations to "AVT Opening Br." refer to the Opening Claim Construction Brief of Plaintiff Advanced Video Technologies LLC (Dkt. No. 25).

distinguish the claimed device requiring "dedicated hardware logic" from prior art devices that performed the same video codec functionality using a "general-purpose processor."  (*See* RIM Opening Br. at 5-7; Mehta Ex. B at 13 ("[E]ven if one skilled in the art were to combine Bose with Shimoda as suggested by the Examiner, the invention of claim 13 would not result. Specifically, Bose implements forward and inverse DCT in *a general-purpose processor environment*.") (emphasis added)).  Although AVT's original claims may have potentially covered a video codec device implemented using a general-purpose processor ***or*** specific, dedicated hardware, the Bose prior art reference already disclosed a device using a general-purpose processor.  Thus, in order to obtain the present claims, AVT elected to narrow the scope of potentially covered devices to only those using circuitry dedicated to performing specific tasks.  Despite this narrowing claim amendment made during reexamination, nothing in AVT's proposed construction appears to exclude the use of the disavowed general-purpose processor. AVT's proposed construction simply ignores the relevant prosecution history.  Such a construction is improper.  *Krippelz*, 667 F.3d at 1266 ("[a] patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer.").

Instead of conforming its proposed construction to the relevant intrinsic evidence, AVT resorts to a general dictionary, citing *Webster's* definition of "dedicated" as "*devoted* to a cause, ideal or purpose."  (AVT Opening Br. at 22; Cockings Ex. G at 589 (emphasis added)).[3]  The claims of the '788 patent, however, have nothing to do with a "cause" or "ideal."  Extrinsic evidence, such as a general dictionary, is "less significant than the intrinsic record in determining

---

[3]     Citations to "Cockings Ex. __" refer to exhibits to the Declaration of Orville R. Cockings (Dkt. No. 26).

the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (internal quotations omitted).  Even so, the more apt definition from a *Webster's* dictionary is one not cited by AVT – the one that applies to the usage of "dedicated" before a technical noun, like "hardware logic."  (Liss Ex. A).[4]  That definition is:  "used only for one particular purpose," for example "a dedicated phone line." (*Id.*)  *Webster's* online version elaborates on that usage example: "We have a dedicated phone line for our computer. [=a phone line that we use only for our computer]."  (Liss Ex. B).  Thus, to the extent consulting to a *Webster's* dictionary is necessary, "dedicated hardware logic" means "hardware logic used only for one particular purpose."  This concept is captured by RIM's proposed construction requiring the claimed "dedicated hardware logic" to be "circuitry for performing specific tasks," as opposed to a general-purpose processor capable of performing general tasks.

Even if the non-technical dictionary definition cited by AVT were relevant (it is not), that definition is actually more consistent with RIM's proposed construction than AVT's.  RIM's proposed construction requires "integrated circuitry" devoted to "performing specific tasks" rather than a general-purpose processor.  By its very nature, a general-purpose processor is neither "dedicated" nor "devoted" to any specific task – and therefore cannot be within the properly construed scope of AVT's amended, reexamined claims.  AVT's proposed construction would appear to allow the claimed "dedicated hardware logic" to perform "video compression and decompression" as well as any number of other, general-purpose functions.  But if the claimed hardware logic could perform additional, general-purpose functions, it would be neither "dedicated" nor "devoted" to any specific tasks.  Thus, AVT's proposed construction is

---

[4]      Citations to "Liss Ex. __" refer to exhibits to the Declaration of Jason Liss in Support of Research In Motion Ltd. and Research In Motion Corporation's Responsive Claim Construction Brief, filed concurrently herewith.

inconsistent with AVT's cited extrinsic definition requiring "devoted" hardware and does not give any meaning to the word "dedicated" – effectively reading it out of the claim.  Such a construction must be rejected.  *See, e.g.*, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (rejecting a construction that would render a recited characteristic "superfluous" because "claims are interpreted with an eye toward giving effect to all terms"); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 815 (Fed. Cir. 2007) (finding that "[o]nly if 'transverse' requires perpendicularity does each claim term have a distinct meaning" otherwise the "scope of the patent [would be] ambiguous").

AVT's observation – that the claims and specification of the '788 patent contemplate that the "dedicated hardware logic" performs tasks other than cosine transforms – provides no support for AVT's proposed construction, nor any basis for selecting it over RIM's.  (*See* AVT Opening Br. at 22-23 (quoting various operations recited in the '788 patent claims)).  RIM's proposed construction expressly refers to DCT/IDCT as mere examples and permits performance of other "specific tasks."  On the other hand, AVT's proposed construction appears to allow the claimed "circuitry" to perform an unlimited variety of general-purpose functions in addition to "video compression and decompression."  AVT's proposed construction is ambiguous, at best. At worst, it improperly expands the scope of the amended, reexamined claims to cover general-purpose processors such as those disclosed in the Bose prior art, which AVT had to distinguish to obtain the '788 patent; AVT cannot recapture through claim construction what it gave up during prosecution.  *See Omega Eng'g*, 334 F.3d at 1323.  Accordingly, the Court should adopt "integrated circuitry for performing specific tasks (*e.g.*, DCT/IDCT), as opposed to a general-purpose processor" as the proper construction of the term "dedicated hardware logic."

- 5 -

**B.  "interim storage of incoming … video data" (Claims 5, 13, and 26)**

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "interim storage of incoming … video data" | "temporary storage of incoming unprocessed video data" | "temporary storage of video data prior to or during compression or decompression by the video codec" |

AVT devotes almost two full pages of its brief to the interpretation of the "interim storage" portion of the claim term, but there is no disagreement about the meaning of "interim storage" – RIM and AVT agree that it refers to "temporary storage."  (*See* AVT Opening Br. at 15-16; RIM Opening Br. at 7).  The parties disagree about the *nature* of the data that is being stored – incoming unprocessed data (RIM) or video data prior to or during compression or decompression (AVT).

As AVT concedes, the reexamination history of the '788 patent directly focused on the issue of what type of data is being stored:  "Although during the reexamination of the '788 patent there was considerable discussion of 'interim storage,' that discussion focused not on the meaning of the term, but rather on *the type of data that was subject to such storage*."  (AVT Opening Br. at 16 (emphasis added)).  The reexamination history confirms that "incoming . . . video data" is data that has yet to be processed, not data that is partially processed or undergoing processing.  Indeed, AVT distinguished its claimed invention from the prior art on this specific basis: "Rather than providing interim storage of input/output data, the frame memory of Suzuki provides storage for video data that is in *intermediate stages of processing* between being input and output," (Mehta Ex. C at 16 (emphasis added)); "Bose did not specify whether incoming/outgoing video data, *as opposed to intermediate processed video data*, is stored in the DRAM."  (*Id.* at 19 (emphases added)).

- 6 -

AVT's proposed construction directly contradicts this intrinsic evidence and impermissibly expands the term to include "video data prior to *or during* compression or decompression."  To support its construction, AVT references portions of the specification that in no way relate to "incoming . . . video data."  (*See, e.g.*, AVT Opening Br. at 17 ("compressed data is inputted on the receive channel and decompressed by the chip," "components within the chip as being responsible for transforming the video data," and a "motion predictor" that "supplies 'frame-difference data . . . to the DCTQ.'"))  AVT tries to stretch the fact that data "exchanged between the components *within* the chip include data at various stages of processing," (AVT Opening Br. at 18 (emphasis added)), to argue that data sent over the "*external* connection to a separate frame memory [DRAM]," for "interim storage of *incoming . . . video data*" somehow includes data at various stages of processing.  (*E.g.*, Mehta Ex. A at cl. 13 (emphases added)).  There is no relationship, however, between these unrelated portions of the '788 patent.  One addresses the purely internal exchange of partially processed data within the chip, whereas the other addresses the external storage of incoming video data prior to any processing.

Once again, AVT disregards the very evidence that it cites, which establishes that "incoming . . . video data" is distinct from data in an intermediate processed form.  (*See* AVT Opening Br. at 16 (recognizing that "during the reexamination of the '788 Patent," the discussion of "interim storage" "focused . . . on the type of data that was subject to such storage")).  RIM's proposed construction – "temporary storage of incoming unprocessed video data" – properly incorporates the limitations of the prosecution and reexamination history and should be adopted.  *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("[T]he prosecution history . . . limits the interpretation of claims so as to exclude any interpretation that

may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.").

### C. "video input data" (Claims 5, 13, 26)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "video input data" | "unprocessed video data" | "video data prior to compression by a video codec" |

The parties dispute whether "video input data" must be unprocessed (RIM) or whether it can include partially processed data (AVT).  In its briefing, AVT correctly explains that, as used in the asserted claims, "incoming video data is video input data" from the "video input connection."  (AVT Opening Br. at 9).  Likewise, AVT explains that this video input connection is "from a camera or another video input source."  (*Id.*)  The specification indicates that this data "is compressed by the video codec 12 and transmitted out in compressed form on a transmit channel."  (*See* Mehta Ex. A at 3:36-51).  The term "video input data" is thus data which has yet to be compressed – it is "unprocessed video data," which is precisely RIM's proposed construction.

Although AVT's construction correctly recognizes that "video input data" must not be compressed, it does not account for AVT's disclaimer of all forms of processing.  To avoid the Bose art during reexamination, AVT distinguished its claims from a device in which "the input video data is passed first to the processing components of the chip" rather than "directly into the DRAM."  (*Id.* (quoting Cockings Ex. E at 267)).  AVT appropriately quotes this critical intrinsic evidence and acknowledges that the term "video input data" was added during reexamination as "an important basis upon which the claims were allowed."  (AVT Opening Br. at 10-11).  But,

AVT's proposed construction does not incorporate its express disclaimer of a device in which "video input data" is processed, rather than directly stored in DRAM in unprocessed form. AVT's proposed construction limiting "video input data" to data "prior to compression" is only partially correct – the prosecution history (and RIM's proposed construction), properly limits "video input data" to data that is not processed in *any* form, not just by compression, *i.e.*, "unprocessed video data."  *See, e.g.*, *Krippelz*, 667 F.3d at 1266; *Standard Oil*, 774 F.2d at 452; *Omega Eng'g*, 334 F.3d at 1323.

### D.  "interim storage of…outgoing video data" (Claims 5, 13, 23, 26)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "interim storage of…outgoing video data" | No construction.  Term lacks written description support.<br><br>If the Court finds adequate written description support: "temporary storage of video data that has been processed and is ready for output". | "temporary storage of decompressed or compressed video data" |

The parties dispute whether this term may be construed (AVT) or lacks written description support (RIM).  AVT's proposed construction, and its briefing, ignores the reexamination history of the '788 patent that bears directly on this issue.  As explained in RIM's opening brief, the Patent Office explicitly found during reexamination that the specification of the '788 patent lacked written support for the interim storage of *outgoing* video data:

> Specifically, the examiner contends that the instant disclosure, as originally filed, ***does not appear to support limitations directed to the storing of the outgoing video within the DRAM*** with respect to the video system embodiment of figures 1 and 2 (as set forth in the claims of the amended claims of the proposed amendment); i.e., wherein "outgoing" is construed as being limited to that video which is provided to the monitor.

(*See* RIM Opening Br. at 10-13; Mehta Ex. E at 5 (emphasis added)).  The Patent Office further

determined that the disclosure of DRAM memory that provides storage of incoming and outgoing video data (*see* Mehta Ex. A at 3:43-45) was insufficient to support AVT's proposed claim element regarding interim storage of outgoing video data.  (*See* Mehta Ex. E at 5-6).  In response, AVT withdrew the phrase regarding the storage of "outgoing video data" from the amended claims and argued that the issue was therefore "moot."  (*See* RIM Opening Br. at 12; Mehta Ex. F at 3, 6, 8, 12, 15).

      AVT's removal of "elements referring to storing outgoing video within the DRAM" and acquiescence with the Patent Office's finding likewise demonstrate that there is insufficient support for the term "interim storage of…outgoing video data" in the present claim element. AVT, however, disregards this key part of the prosecution history and focuses instead on "outgoing video data" as though the term stands alone.  (*See* AVT Br. at 19 (arguing that "outgoing video data" is "information that is transmitted or output from the chip")).  In so doing, AVT ignores the pertinent issue.  The issue is not whether the specification supports an interpretation of "outgoing video data" but whether the specification discloses "interim storage" of such data.

      Because, as the Patent Office found, the specification of the '788 patent does not provide support for the "interim storage of . . . outgoing video data" and because AVT has offered no argument that the '788 patent supports the entire phrase at issue, RIM respectfully requests that the Court find that the phrase lacks written description support as required by 35 U.S.C. § 112(1).  *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) (affirming summary judgment of invalidity of "spikeless" claims where the patentee "failed to point to any disclosure in the patent specification that describes a spikeless valve").  Should the Court find written description support exists, AVT's proposed construction is impermissibly

broad and fails to incorporate its express disclaimers made during reexamination.  Applicants, in

distinguishing its claims from the Bose prior art reference, stated that "by its nature outgoing

video data is already processed and is indeed ready to be output."  (Mehta Ex. C at 19; *see also*

RIM Opening Br. at 12-13).  Because RIM's alternative proposed construction incorporates this

limitation and AVT's does not, "outgoing video data" – to the extent the Court decides to

construe it – must mean "temporary storage of video data that has been processed and is ready

for output."

### E.  "quantization" (Claim 5, 13, 23, 26)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
| --- | --- | --- |
| "quantization" | "a process in which the continuous range of values of an input signal is divided into non-overlapping subranges, and to each subrange a discrete value of the output is uniquely assigned" | "conversion of data from a relatively large set to a smaller and discrete set" |

AVT's brief cites multiple dictionary definitions for the term "quantization."  (*See* AVT

Opening Br. at 24).  First, AVT cites the *McGraw-Hill* dictionary defining quantization as

"[d]ivision of the range of values of a wave into a finite number of subranges, each of which is

represented by an assigned or quantized value within the subrange."  (*Id.*)  AVT also cites the

following *IEEE Dictionary* definition: "In communication, quantization is a process in which the

range of values of a wave is divided into a finite number of smaller subranges, each of which is

represented by an assigned (or quantized) value within the subrange."  (*Id.*)

Rather than adopting one of these dictionary definitions, AVT proposes a construction

that appears to be made out of whole cloth: "conversion of data from a relatively large set to a

smaller and discrete set." AVT's proposed construction does not resemble either dictionary definition; neither does it incorporate any of the concepts required by its cited definitions, including a "division" of a "range of values," "a finite number of subranges," and "assigned" values. AVT does not explain how its proposal squares with the dictionary definitions upon which it purports to rely or why it does not simply adopt the definitions it cites. Furthermore, AVT's proposed construction creates ambiguity by introducing imprecise terms such as "relatively large."

As demonstrated by the very definitions AVT cites, quantization is a well-understood process familiar to those skilled in the art. The meaning of this process is effectively conveyed by the first definition available from the *IEEE Dictionary*: "a process in which the continuous range of values of an input signal is divided into non-overlapping subranges, and to each subrange a discrete value of the output is uniquely assigned." AVT's opening brief offers no reason not to adopt this precise and well-founded definition, as proposed by RIM.

### F. "video compressor/decompressor disposed fully within the chip" (Claims 5, 13, 23, 26)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "video compressor/decompressor disposed fully within the chip" | No construction required. The term can be understood by a person of ordinary skill in the art by its plain and ordinary meaning. | "circuitry located entirely within the chip for video compression and decompression" |

From the briefing, RIM and AVT appear to agree on the meaning of the term "video compressor/decompressor disposed fully within the chip." As AVT explains:

> The specification and prosecution history show that the same circuitry (*i.e.*, 'shared resources') is used for compression and decompression. And the plain language requires that circuitry must be located entirely within the chip as recited.

(AVT Opening Br. at 21). This meaning, however, is perfectly reflected in the term itself: "video compressor/decompressor disposed fully within the chip." AVT's proposed construction, in contrast, is potentially more expansive than it argues in its briefing. AVT's proposed construction does not clearly state that ***all*** of the "circuitry . . . for video compression and decompression" must be "located entirely within the chip," as it concedes in its opening brief. AVT's proposed construction could be misunderstood as potentially covering devices in which some portion of the "video compressor/decompressor" is located within the chip, while other portions are outside the chip. This would be contrary to AVT's stated understanding of the term.

Because the parties agree that ***all*** of the "circuitry . . . for video compression and decompression" must be "located entirely within the chip," and the claim language itself more precisely captures this agreed meaning than the construction proposed by AVT, RIM respectfully requests that the Court not construe this term and instead apply its plain and ordinary meaning.

**G.** **"video input connection" and "a video input connection from a camera" (Claims 5, 13, 26)**

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "video input connection" | "input for receiving analog video signals provided by a camera" | "one or more external connection pins or ports for receiving video data" |
| "a video input connection from a camera" | "an input for receiving analog video signals provided by a camera" | "one or more external connection pins or ports for receiving video data from a camera" |

- 13 -

AVT's brief does not address the primary dispute between the parties – whether the data received by the video input connection may be digital or analog (AVT) or whether it is limited to analog data only (RIM).  As RIM discussed at length in its opening briefing and will revisit below, the intrinsic record does not allow for the video input connection to receive both digital and analog data, it only allows for analog data.  (*See* RIM Opening Br. at 16-17).  Accordingly, RIM's constructions of the terms "video input connection" and "video input connection from a camera," which are appropriately limited to an input for receiving analog data, should be adopted.

First, as the Applicants represented to the Patent Office during prosecution, the video data received on the video input connection must be sampled and digitized.  (*See* Mehta Ex. H at 13 ("The claimed present invention receives the incoming video and then samples and digitizes it")).  Because only analog data can be digitized, the data received on the video input connection *must be analog data.*  (*See* Mehta Ex. G at 264).

Next, in the Notice of Intent to Issue Ex Parte Reexamination Certification (NIRC), the patent examiner distinguished the Suzuki prior art reference as comprising only "*blocks of image data*" which was distinct from "video signal data in raster scan format."  (Mehta Ex. I at 2).  Also according to the examiner, the '788 patent specification teaches "[t]hat the signals being provided from the 'NTSC-compatible or PAL-compatible camera' [] of figure 1 are of a raster-scan format and, as such, that these signals must be converted to a 'block' format prior to encoding."  (Mehta Ex. I at 3-4).  Thus the Applicants represented, and the patent examiner understood, that the video input connection requires analog signals, such as PAL or NTSC.  (*See* RIM Br. at 17 (explaining that NTSC and PAL are standards for analog television signals)).

- 14 -

Third, as noted by AVT in its brief, the specification provides that the video codec chip "is connected *to receive a video input for a NTSC-compatible or PAL-compatible camera* 14 and a monitor 16." (Mehta Ex. A at 3:41-43) (emphasis added).  Once more, because NTSC and PAL are analog signals, the video input must be *analog*.

AVT focuses its arguments on the type of "connection" required in the term "video input connection."  But the specification language AVT cites referring to "ports" (*see* AVT Opening Br. at 8 (quoting Cockings Ex. A at 6:53-43)) and "external connection pins" (*see id.* (quoting Cockings Ex. A at 12:50-60)) says nothing about the type of signals received by the claimed "video input connection."  Because the disclosure of the '788 patent and AVT's statements during prosecution limit the "video input connection" to receiving analog data, AVT's proposed claim construction should be rejected and RIM's adopted.  *See, e.g., Krippelz*, 667 F.3d at 1266; *Standard Oil*, 774 F.2d at 452; *Cordis Corp.*, 658 F.3d at 1357.

### H.   "video information received from said [or the] video input connection" and "video input data from the video input connection" (Claims 5, 13, 26)

| '788 Claim Term | RIM's Proposed Construction | AVT's Proposed Construction |
|---|---|---|
| "video input data from the video input connection" | "unprocessed analog video signals provided by a camera" | "video data prior to compression by a video codec received at one or more external connection pins or ports" |
| "video information received from said [or the] video input connection" | "unprocessed analog video signals provided by a camera" | "video data prior to or during compression by a video codec received at one or more external connection pins or ports" |

As discussed in RIM's opening brief, the parties' proposed constructions reflect that these terms should be construed as combinations of the terms "video input data" (or "video

- 15 -

information") and "video input connection."  The parties dispute the proper definition of these terms as set forth in Sections B, C and G, above.

AVT further asserts that because the term "video information received from said [or the] video input connection" "appears later in the claims than the phrase 'video input data from the video input connection,'" the "video information" must have "moved . . . further into the chip" and been "received by other components within the chip."  (AVT Opening Br. at 13).  Although these two terms do appear in "later" claim limitations, the order of the claim terms has no bearing whatsoever on the construction of claim terms in an apparatus claim.  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) (holding that the district court erred in construing an apparatus claim term with reference to a method claim term because "pure apparatus claims" are "not limited to any particular . . . sequence" and citing *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1372-1373 (Fed. Cir. 2004) for the proposition that "[c]ourts must generally take care to avoid reading process limitations into an apparatus claim." ); *see also Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 1:CV-09-1685, 2010 WL 3896206, *9 (M.D. Pa. Sept. 30, 2010) (rejecting a proposed construction that "improperly seeks to add a process limitation into an apparatus claim" because apparatus claims "indicate the patentees['] intention of patenting an apparatus that has specific . . . properties").  As discussed in RIM's opening brief and above in Sections B, C and G, the intrinsic record limits video input data to video data that is *unprocessed* (RIM Opening Br. at 7-9) and video input connection to receive only *analog* data (RIM Opening Br. at 16-17).  Thus, RIM's constructions are correct and should be adopted.

## V.      CONCLUSION

For the foregoing reasons, RIM respectfully requests that the Court adopt RIM's

proposed constructions.

Dated: August 17, 2012                              Respectfully submitted,

                                                    WILMER CUTLER PICKERING
                                                    HALE AND DORR LLP


                                                    By: */s/ Erin Greenfield Mehta*
                                                          Dominic E. Massa (admitted *pro hac vice*)
                                                          Jason H. Liss (admitted *pro hac vice*)
                                                          60 State Street
                                                          Boston, MA 02109
                                                          t: (617) 526-6000
                                                          f: (617) 526-5000

                                                          Erin Greenfield Mehta
                                                          7 World Trade Center
                                                          250 Greenwich Street
                                                          New York, NY 10007
                                                          t: (212) 230-8800
                                                          f: (212) 230-8888
                                                          Attorneys for Defendants
                                                          Research In Motion Ltd., and
                                                          Research In Motion Corporation