UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

ADVANCED VIDEO TECHNOLOGIES, LLC,

      Plaintiff,

    -against-

HTC CORPORATION and HTC AMERICA, INC.,

      Defendant.

——————————————————————————— x

ADVANCED VIDEO TECHNOLOGIES, LLC,

      Plaintiff,

    -against-

BLACKBERRY, LTD. AND BLACKBERRY
CORPORATION,

      Defendants.

——————————————————————————— x

ADVANCED VIDEO TECHNOLOGIES, LLC,

      Plaintiff,

    -against-

MOTOROLA MOBILITY LLC,

      Defendant.

——————————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___4/28/15___

No. 11 Civ. 06604 (CM)

No. 11 Civ. 08908 (CM)

No. 12 Civ. 00918 (CM)

# MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS

McMahon, J.:

    In civil actions 11 Civ. 06604, 11 Civ. 08908, and 12 Civ. 00918, Plaintiff Advanced Video

Technologies, LLC ("AVT"), a New York corporation with its principal place of business in this

District, alleges that by defendants HTC Corporation and HTC America Inc., Blackberry Ltd. and Blackberry Corporation, and Motorola Mobility, LLC, are infringing U.S. Patent No. 5,781,788 ("the '788 Patent"), entitled "Full Duplex Single Chip video [sic] Codec." Presently before the Court is a motion, filed jointly by all defendants, urging the Court to dismiss these cases for lack of subject matter jurisdiction, under Fed. R. Civ. P. 12(b)(1). Defendants argue that AVT owns no interest in the patents in suit, thereby depriving it of standing to sue; it argues in the alternative that a one-third owner of the patent has not been joined in the lawsuit, which calls for this court to find a want of "prudential standing."

Because AVT has not demonstrated that it owns any interest in the patent in suit, the joint motion to dismiss is GRANTED and the above-captioned actions are DISMISSED.

## BACKGROUND

Plaintiff AVT is not the inventor listed on the '788 patent, and it does not employ any inventor listed on the patent. It contends that it acquired title as a result of a series of assignments and corporate transactions.

The inventors listed on the patent in suit are three: Vivan Hsiun; Beng-Yu "Benny" Woo; and Xiaoming Li.

In January 1992, while Hsiun was employed at a now defunct company called Infochips Systems, Inc. ("Infochips"), she signed an "Infochips Systems Inc. Employee Proprietary Information Agreement," ("the employment agreement"). Section 2(b) of the employment agreement, entitled "Retaining and Assigning Inventions and Original Works," provided, under the subheading "Inventions and Original Works Assigned to the Company":

> I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and *will assign to the Company all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived*

2

*or developed or reduced to practice, during the period of time I am in the employ of the Company.*

Section 2 goes on:

*I agree that my obligation to assist the Company to obtain United States or foreign letters patent, copyrights, or mask work rights covering inventions, works of authorship, and mask works, respectively, assigned hereunder to the Company shall continue beyond the termination of my employment,* but the Company shall compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance.

*If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign letters patent,* copyrights, or mask work rights covering inventions or other rights assigned to the Company as above, *then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications* and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyrights, and mask work rights with the same legal force and effect as if executed by me.

(Emphasis added).

Seventeen months earlier, on September 5, 1990, Infochips had entered into a "Security Agreement" with a company called Lease Management Services, Inc. ("LMS"). (*See* Docket #102-3[1] at AVT0000115-18.) In the Security Agreement, Infochips pledged its "Receivables" as collateral for its fulfillment of its payment and performance obligations under a Master Equipment Lease and Equipment Financing Agreement. Infochip's "receivables" included its "Accounts, Instruments, Documents, Chattel Paper *and General Intangibles (as defined in the Uniform Commercial Code)* and all other rights arising from the sale of Debtor's Inventory," and related rights, remedies, books, records, and proceeds. (*Id.*) (emphasis added). The Uniform Commercial Code defines "General Intangibles" as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods,

---

[1] For simplicity's sake, I have used the docket numbering of the first action, 11 Civ. 06604. However, identical documents have been filed in all three actions.

3

instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." UCC §9-102.

Hsiun's employment contract meets the definition of a "general intangible" under the UCC. It was, therefore, among the assets pledged to LMS as security – provided that after-acquired and after-created assets (like the contract, which came into existence long after the Security Agreement) automatically became security for the LMS loans. The Security Agreement does not specifically provide one way or the other, though one could infer, particularly from the language in the agreement about the aging of Accounts Receivable, that the parties intended for after-acquired assets to fall into the pot of assets pledged as security to LMS. That is the way such agreements customarily work. It is not necessary to resolve that question to decide this motion.

In or about 1993, Infochips went out of business. LMS seized the assets pledged in the Security Agreement. (Docket #102-3 at AVT0000126-27.) If indeed Hsuin's employment agreement was in the pot of assets securing Infochips' performance under the Security Agreement, LMS seized it along with the other assets.

The parties do not cite to any specific evidence that Hsiun made her contribution to the '788 patent during her brief period of employment with Infochips. However, as AVT relies on the employment agreement and it covers only inventions created during the course of Hsuin's employment with Infochips, I will make that assumption.

Woo Purchases the Pledged Assets from LMS

In March 1995, co-inventor Benny Woo purchased the pledged assets, including Hsiun's employment contract, from LMS. (Docket #102-3 at AVT0000131.) A few months later, on June 29, 1995, Woo transferred his rights to the assets he had acquired from LMS to a company of

4

which he was the principal, AVC Technology, Inc. ("AVC" – and not to be confused with plaintiff AVT). Therefore, to the extent that Hsuin's employment contract with Infochips was security under the LMS Security Agreement, AVC acquired that interest.

### Woo's Company, AVC, Obtains the Patent In Suit

On May 8, 1995, Woo's company, AVC, filed U.S. Patent Application No. 08/437,276 ("the '276 application") with the Patent Office. The '276 application is the parent application of the '788 patent.

The '276 application named three co-inventors –Woo, Hsiun, and Li – the same three co-inventors listed on the face of the '788 patent.

Patent Office regulations require each inventor or co-inventor to execute an "oath" or "declaration" stating, among other things, that the individual is an inventor and that he or she authorizes the filing of the application. 37 C.F.R. § 1.63(a). In its initial submission to the Patent Office, AVC submitted unsigned inventor oaths for all three inventors.

AVC also submitted unsigned "assignments" from the three inventors of their rights in the claimed invention.

The omission of signatures on these critically important forms did not go unnoticed. In June 1995, the Patent Office notified AVC that both the inventor oaths and assignments had to be signed.

AVC promptly obtained signed inventor oaths from all three inventors and submitted them to the patent office. But AVC did not obtain executed *assignments* from all three inventors: On January 26, 1996, AVC recorded with the Patent Office assignments from Woo and Li, but *not* from Hsiun. AVC tried to obtain an assignment from Hsiun, but after putting off an AVC agent several times, Hsiun expressly refused to assign her rights in the claimed invention to AVC.

5

As a result, AVC filed a petition with the Patent Office in August 1995, asking for permission to prosecute the application without obtaining Hsiun's signature. AVC's position was that Hsuin was obligated by her employment agreement with Infochips – which Woo had purchased from LMS and assigned to AVC – to assign her interest in the invention to AVC or its successor in interest. sRichard Cortez, the office manager for Infochips, submitted a declaration to the Patent Office documenting his unsuccessful efforts to convince Hsiun to assign her interest in the invention to AVC. (Docket #102-3 at AVT0000138-140.) Woo also submitted a declaration to the Patent Office, as evidence that he had purchased Infochips' rights under Hsiun's employment agreement from LMS; he attached both "a copy of the agreement whereby the omitted inventor agreed to assign this invention and the documentation wherein the rights in said agreement were purchased by me." (Chen Decl., Ex. 3 at AVT0000107).

This seems to have satisfied the Patent Office, since AVC applied for and prosecuted the patent without obtaining a written assignment from Hsuin. On July 14, 1998, the patent in suit was issued to AVC as assignee.

AVC to Epogy to AVT

Some years later, on July 17, 2000, AVC agreed to be purchased by Epogy Communications, Inc. ("Epogy").

The Purchase Offer Agreement between AVC and Epogy provides, describes the proposed transaction – the purchased of 90% or more of AVC's stock to be followed by a statutory short-form merger under state law -- as follows:

Pursuant to this cash for stock transaction . . . Epogy will promptly offer to purchase and AVC's shareholders will have the opportunity to transfer and assign to Epogy all outstanding stock of AVC (and all claims with respect to such stock, on a fully diluted basis). Notwithstanding anything to the contrary, if less than 100% but 90% or more of the shares are proffered for purchase by Epogy, Epogy will close upon the purchase of the shares proffered . . . no later than July 31, 2000. Thereafter

6

> Epogy will pursue a statutory short form merger . . . *It is also Epogy's intent that upon closing 100% ownership by Epogy, AVC will be absorbed into Epogy (rather than maintained as a wholly owned subsidiary), and, subject to any limits on assignability with respect to AVC contracts, Epogy will succeed to all assets, rights, causes of action and claims of AVC, including, without limitation, current assets, equipment, software, CAD tools, technology, products, research and development results, intellectual property (including patents,* copyrights, mask works, trademarks and all related rights) and know-how (together with the documents, writings and electronic and magnetic files relating thereto).*

(AVT0024726, § 1). (Emphasis added) This agreement was recorded with the Patent Office.

AVT has presented evidence that Epogy successfully acquired 100% of the shares of AVC. However, no documents required to effectuate a statutory short form merger were ever filed, either in Delaware (where AVC was incorporated) or in California (where Epogy was incorporated). (Chen Decl., Exs. 6-9.) AVT now admits that the two corporations never merged.

AVC was, however, eventually dissolved. The shareholder vote authorizing its dissolution took place on September 30, 2002, and the Certificate of Dissolution was filed on November 1, 2002. (*See* Certificate of Dissolution, Docket #102-6.).

Several months later, on January 15, 2003, Epogy transferred whatever rights (if any) it had in the '788 patent to a Mr. J. Nicholas Gross.

Mr. Gross assigned his rights (if any) in the patent to Plaintiff AVT on April 30, 2003.

AVT's title to the patent is, therefore, entirely contingent on Epogy's title; if Epogy never acquired title to AVC's interest (be that entire or 66.67%) in the '788 patent, then AVT lacks any interest in the patent.

AVT filed the present action in 2011. For subject matter jurisdiction purposes, its standing to sue must be ascertained as of that date. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (citing *Keene Corp. v. United States,* 508 U.S. 200, 207 (1993)).

7

Defendants filed the instant motion to dismiss for lack of subject matter jurisdiction in December 2014, after learning about this series of transactions during discovery.

## DISCUSSION

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), a district court need not confine itself to the allegations in the pleadings or accept them as true. A district court may instead refer to documents and evidence outside the pleadings in ruling on the motion. *See, e.g., Makarova v. United States*, 201 F.3d 110, 112 (2d Cir. 2000). And even when there are disputed issues of fact; the district court is empowered to resolve them in the manner it sees fit. *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939); *see also Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006) (reviewing acceptable procedures used by district courts in determining jurisdictional questions).

Fortunately, there are no disputed issues of *material* fact raised by the record submitted to this court. *Cf. Lawrence v. Dunbar*, 919 F.2d 1525, 1529–30 (11th Cir. 1990). As such, I am able to proceed on the affidavits and other record materials before me. *See Alliance For Envtl. Renewal, Inc.*, 436 F.3d at 88 (citing *Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir.1976)).

I.     **Standard**

Article III of the Constitution limits federal courts' subject matter jurisdiction to certain "Cases" and "Controversies." "The doctrine of standing is one of several doctrines that reflect this fundamental limitation. It requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal citations and quotations omitted) (emphasis in original).

The plaintiff has the burden of establishing Article III standing as to each type of relief he

wishes to pursue. *Los Angeles v. Lyons*, 461 U.S. 95, 103, 105 (1983). To meet that burden, he

must show:

> (1) an injury in fact, (2) a sufficient causal connection between the injury and the
> conduct complained of, and (3) a likelihood that the injury will be redressed by a
> favorable decision.

*Susan B. Anthony List v. Driehaus*, __ U.S. __, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal citations and quotation marks omitted).

The Federal Circuit has explained that, in patent cases, "injury in fact" can only be suffered

by one who holds exclusionary rights to the patent:

> A patent grant bestows the legal right to exclude others from making, using, selling,
> or offering to sell the patented invention in the United States, or importing the
> invention. *See* 35 U.S.C. § 154; 35 U.S.C. § 271 . . . This right to exclude is the
> legal interest created by statute . . . Constitutional injury in fact occurs when a party
> performs at least one prohibited action with respect to the patented invention that
> violates these exclusionary rights . . . The party holding the exclusionary rights to
> the patent suffers legal injury in fact under the statute.

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) (internal quotations and citations

omitted). Because he lacks the exclusionary right that infringement injures, a plaintiff who lacks

"enforceable title to [a] patent at the inception of [his] lawsuit" will be unable to show "injury in

fact," and is thus unable to meet his burden to show that he has Article III standing to pursue his

claim. *Abraxis Bioscience, Inc. v. Navinta, LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). And if the

plaintiff lacks standing, federal courts lack subject matter jurisdiction to adjudicate his claim. *Id.*

"A party that has been granted all substantial rights under the patent, 'regardless of how

the parties characterize the transaction that conveyed those rights,' is considered to have legal title,

and therefore standing." *Sky Technologies LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009)

(quoting *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000)). "Thus, it is the

9

substance of what was granted, that determines the rights in the patent, not the form." *Id.* (internal citations and quotation marks omitted).

With few exceptions, state law governs whether a plaintiff has enforceable title to a patent. *DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1296 (Fed. Cir. 2008) (Newman, J., describing the rule and dissenting as to the recognition of an exception) ("State statutory and common law have long been recognized as governing the ownership of patent property.") (citing *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent right and on what terms typically is a question exclusively for state courts.")).

Nonetheless, patents are a creature of federal law, and the Federal Patent Act requires certain formalities in order to convey ownership rights in a patent to another. All assignments of interests in a patent, for example, must be in writing. 35 U.S.C. § 261; *see also Skye Technologies*, 576 F.3d at 1379; (citing *Ager v. Murray*, 105 U.S. 126, 131-32 (1881) (internal citations omitted)).

But, "there is nothing that limits assignment as the only means of transferring patent ownership . . . ownership of a patent [also] may be changed by operation of law." *Id.* (citing *Akazawa v. Link New Technology International, Inc.*, 520 F.3d 1354, 1356 (Fed. Cir. 2008)). Thus, state statutes of foreclosure and intestacy, as well as the adoption of the Uniform Commercial Code (in one state), have been held to effect transfers of title to patents. *Id.* (collecting cases).

## II. Only the July 2000 Transfer from AVC to Epogy Implicates Subject Matter Jurisdiction

The defendants have identified three purported defects in AVT's claim to have title to the '788 patent. Only one of them, however, implicates this court's subject matter jurisdiction.

If Hsiun never conveyed any interest in the invention to Infochips by virtue of her employment agreement, there would obviously be a defect in AVT's title to the extent it purports to derive from Hsuin's employment agreement. The parties disagree about whether Hsuin's employment contract – which obligated Hsuin to (1) assign her interest in any "invention" created during her employment to her employer and (2) cooperate in the prosecution of any patent to be procured on that invention by her employer – was an agreement to assign "patent rights" in the future, which would be void. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841-42 (Fed. Cir. 2009) *aff'd*, 131 S. Ct. 2188, 180 L. Ed. 2d 1 (2011). Obviously, if the employment agreement did not in fact transfer to Infochips any rights in the invention that was eventually the subject of the '788 patent, then LMS, and later Woo, and eventually AVC never acquired Hsuin's one third interest in the invention. That would make her an absent co-owner of the patent.

Similarly, if Infochips, having acquired Hsiun's rights to the invention, failed to assign those rights to LMS under the Security Agreement, then there would be a gap in AVT's title as well. LMS could only have taken title to Infochips' rights under the employment agreement if after-acquired assets or after-created rights automatically became "security" on the date they were created or acquired. As noted above, that appears to be an open question, given the wording of the Security Agreement. Again, this argument implicates only Hsuin's partial interest in the patent – not the ownership interests of Woo and Li, which they conveyed to AVC, and which AVC believes it conveyed to Epogy. But if Hsuin's contract was never assigned to LMS, then Hsuin remained at all times a co-owner of the patent.

Prudential concerns sometimes require the dismissal of infringement suits in the absence of patent co-owners, because a defendant should not be sued repeatedly for the same acts of

infringement and on the same patent. *See Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 704-05 (Fed. Cir. 2008). So too, a co-owner's patent rights can be said to include the right to impede another co-owner's pursuit of infringement actions. *STC. UNM v. Intel Corp.*, 767 F.3d 1351, 1353 (Fed. Cir. 2014) (citing *Schering Corp. v. Roussel–UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997) ("Ordinarily, one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit.") (internal citation omitted).

However, the rationale underlying this rule is purely one of "prudential" standing – that is, one of statutory interpretation concerning who has a cause of action under the statute and under what circumstances. *Id.* And as the Supreme Court recently clarified, prudential or statutory standing is not really "standing" at all. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 1388 n. 4 (2014) (analyzing the Lanham Act). As a result, no motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) lies where the alleged "lack of standing" is merely prudential:

> We have on occasion referred to th[e] inquiry [whether a plaintiff has a cause of action under a statute] as "statutory standing" and treated it as effectively jurisdictional. See, *e.g., Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 97, and n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); cases cited *id.*, at 114–117, 118 S.Ct. 1003 (Stevens, J., concurring in judgment). That label is an improvement over the language of "prudential standing," since it correctly places the focus on the statute. But it, too, is misleading, since "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case.'" *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–643 (2002) (quoting *Steel Co.,supra,* at 89, 118 S.Ct. 1003); see also *Grocery Mfrs. Assn. v. EPA,* 693 F.3d 169, 183–185 (Kavanaugh, J., dissenting), and cases cited therein; Pathak, Statutory Standing and the Tyranny of Labels, 62 Okla. L.Rev. 89, 106 (2009).

*Id.*

The third and most glaring alleged defect in AVT's title, however, raises an issue of actual, not prudential, standing – which is to say, it raises the question whether AVT has any interest in the patent whatsoever. That issue does implicate this court's subject matter jurisdiction because, if

12

plaintiff AVT has no rights at all in the '788 patent, it could have suffered no injury-in-fact from defendants' alleged infringement. Absent injury-in-fact, AVT has no right to sue for infringement. *Abraxis Bioscience, Inc.*, 625 F.3d at 1363.

The potential defect is Epogy's purported failure to acquire *any* of AVC's rights in the '788 patent from AVC after it acquired 100% of AVC's stock. If Epogy failed to acquire title to AVC's assets before assigning the patent to Gross in January 2003, then Gross had nothing to assign to AVT in April 2003, and AVT does not own any interest at all in the '788 patent.

Since the AVC-Epogy transfer is the only transfer whose validity implicates this Court's subject matter jurisdiction, it is appropriate to consider it first, and to reach the prudential issue only if needed. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *see also Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006). Here, there is no need to reach the prudential issue, because the actual standing issue is dispositive.

## III.    **AVT Has Failed to Show, or Even Raise A Genuine Issue of Material Fact, that it Has Any Interest at All in the '788 Patent.**

AVT's theory of how Epogy came to acquire AVC's rights in the patent in suit has shifted over time.

At first, AVT claimed that the patent rights were transferred when AVC was merged into Epogy in a short-form statutory merger. AVT now concedes that no such merger ever took place.

Instead, AVT now argues that no short-form merger was needed, because Epogy acquired AVC's assets (including its interest in the '788 patent) because Epogy purchased all of AVC's stock before AVC dissolved. (*See* Docket # 163 at 1-2.) AVT cites no authority for this assertion, and understandably so, because Epogy did not acquire any of AVC's assets simply by purchasing

13

100% of its stock. That is a well-settled proposition of corporate law in both Delaware (where AVC as incorporated) and California (where Epogy was incorporated).

In a 1963 opinion, *Orzeck v. Englehart*, 41 Del. Ch. 361, 365, 195 A.2d 375, 377 (1963), the Delaware Supreme Court was confronted with the question of whether the purchase by one corporation of all the stock in another corporation effected a transfer of the assets of the purchased corporation to its new parent. The answer was no:

> the transaction complained of was the purchase by one corporation of all of the stock of seven other corporations. On its face there is nothing illegal in this. On the contrary, it is specifically authorized by 8 Del.C. § 123. Once the acquisition has been made the purchasing corporation thereafter has the status of a stockholder of the corporation whose shares it has purchased **and nothing more. In other words, the purchasing corporation is not the owner of the assets of the other corporation, but is merely a stockholder with all the incidents of such. Nor do the corporate identities merge by reason solely of the purchase by one of all of the other's stock."**

*Id.* (citing *Owl Fumigating Corp. v. California Cyanide Co.*, 3 Cir., 24 F.2d 718; *Fidanque v. American Maracaibo Co.*, 33 Del.Ch. 262, 92 A.2d 311) (emphasis added); *see also Buechner v. Farbenfabriken Bayer*, 154 A.2d 684, 686-87 (Del. 1959) (a parent company "has no interest of any specific assets of the [wholly-owned subsidiary]" because "[t]he corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation."). This is part and parcel of the:

> settled principles of corporate law which establish that the corporation, not the stockholders of the corporation, owns the property, rights, and privileges of the corporation. *See, e.g., Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A.2d 450 (Del.Ch.1967), *aff'd*, 239 A.2d 629 (Del.1968); *Fletcher Cyclopedia of the Law of Private Corporations* § 5100 (1986). "It is an entity distinct from its stockholders even if its stock is wholly owned by one corporation." *Pauley Petroleum, Inc.*, 231 A.2d at 454 (citing *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684 (Del.Ch.1959) and *Bird v. Wilmington Society of Fine Arts*, 43 A.2d 476 (Del. Ch. 1945)). "Once the acquisition has been made the purchasing corporation thereafter has the status of a stockholder of the corporation whose shares it has purchased and nothing more. In other words, the purchasing corporation is not the owner of the assets of the other corporation, but is merely a stockholder with all the

incidents of such." *Orzeck v. Englehart,* 195 A.2d 375, 377 (Del. 1963).

*Texaco Ref. & Mktg., Inc. v. Delaware River Basin Comm'n,* 824 F. Supp. 500, 506-07 (D. Del. 1993) *aff'd,* 30 F.3d 1488 (3d Cir. 1994)

The 2015 edition of "Folk on the Delaware General Corporation Law," the leading treatise on the subject, explains that, while Section 123 of the Delaware Corporate law "authorizes Delaware corporations to acquire, hold, and dispose of the securities of other entities and to exercise the rights of ownership, including the right to vote . . . after an acquisition of shares under 123, a purchasing corporation has the status of a stockholder of the corporation whose shares it has purchased and nothing more." Folk at Section 123.01-02, GCL-81.

Of course, Epogy, which was the acquiring corporation here, is a California corporation, not a Delaware corporation. However, the law is no different in California: when a corporation acquires all of the stock of another corporation, it does not thereby become the owner of the assets of its now wholly-owned subsidiary. In 1941, the California Supreme Court declared that it was "fundamental, of course, that the corporation has a personality distinct from that of its shareholders, and that the latter neither own the corporate property nor the corporate earnings." *Miller v. McColgan,* 17 Cal. 2d 432, 110 P.2d 419, 421 (1941); *see also* 15 Cal. Jur.3d Corporations § 335 ("The shareholders are not the owners of corporate property.").[2]

_____

[2] Indeed, as no less an authority than the Supreme Court explained more recently: "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets... A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474–75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (citations omitted); 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 31 (2006) ("The property of the corporation is its property and not that of the shareholders as owners . . .That is to say, the capital or assets of the corporation are its property, and the shares evidenced by the stock certificates are the property of the shareholders, which do not carry the capital property or any profits until they have been declared and vested as dividends.... A holding corporation does not own the subsidiary's

15

So under the relevant state law, Epogy did not automatically become vested with ownership in the '788 patent upon acquiring 100% of the stock of AVC. Notwithstanding the parties' express statement that they did not intend that AVC remain a wholly-owned subsidiary of Epogy (see *supra*, page 7), Epogy's acquiring 100% of the stock of a Delaware corporation did nothing except create a parent-subsidiary relationship; it did not transfer ownership of the acquired corporation's assets to the new parent corporation (Epogy). To do that, something more was needed.

That something could have been an assignment, which is the recognized method of transferring patent rights between a parent and its subsidiary: "Common corporate structure does not overcome the requirement that even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010). But there was no such assignment.

So AVT insists that Epogy acquired ownership of the '788 patent from its wholly-owned subsidiary incident to AVC's dissolution. Citing Del. Code. Ann. tit. 8, § 281(b), AVT states that, "it is black letter law that any assets remaining when a corporation is dissolved are to be distributed to stockholders." (Docket #163, AVT Letter of Apr. 21, 2015 at 2-3.) And indeed §281(b) provides, in pertinent part:

> A dissolved corporation or successor entity . . . shall, prior to the expiration of the period described in § 278 of this title, adopt a plan of distribution pursuant to which the dissolved corporation or successor entity (i) shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims known to the corporation or such successor entity, (ii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party and (iii) shall

property."); 18A Am.Jur.2d Corporations § 632 ("Even complete ownership of all outstanding stock of a corporation is not the equivalent of ownership of a subsidiary's property or assets, because a parent and subsidiary comprise two wholly separate entities with individual property rights, no transfer of title to corporate property taking place.").

16

make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 10 years after the date of dissolution. The plan of distribution shall provide that such claims shall be paid in full and any such provision for payment made shall be made in full if there are sufficient assets. If there are insufficient assets, such plan shall provide that such claims and obligations shall be paid or provided for according to their priority and, among claims of equal priority, ratably to the extent of assets legally available therefor. **Any remaining assets shall be distributed to the stockholders of the dissolved corporation.**

(Emphasis added). Since Epogy purchased all the outstanding shares of AVC, AVT argues, Epogy was entitled to distribution of all AVC's "remaining assets" – including AVC's interest in the patent-in-suit – upon AVC's dissolution.

The problem with this argument is it misconstrues the way Delaware corporate law works.

When a Delaware corporation files a certificate of dissolution, it does not simply evaporate. Rather, it "dissolves" only for the purpose of continuing to do business. By operation of law, Del. Ann. Code §278, the corporation remains continues in existence for a period of at least three years from the date of dissolution – more, if the period is extended by the Court of Chancery – for the limited purpose of allowing it to wind up its affairs. To that end, it can sue and be sued, dispose of or convey its property and discharge its liabilities. Only after all of that is done is a Delaware corporation permitted "to distribute to their stockholders any remaining assets" – that is, any assets that remain after satisfaction of all liabilities – pursuant to §281(b). Under § 281, stockholders are last in line; they are entitled to receive, not all the assets of a dissolved corporation, but only "remaining assets" – the assets that are left over after all other corporate creditors have been satisfied, or provision made for them to be satisfied.

AVT's brief in opposition to the motion to dismiss highlights the last sentence of § 281(b) but conspicuously fails to acknowledge the rest of the statute, or its interplay with § 278. That

interplay is critical, becasuse §281(b) requires that a dissolving corporation or some successor entity adopt a "plan of distribution" of the dissolving corporation's assets at some time during "the period described in §278" – i.e., the three year statutory wind-down period. As the Delaware Supreme Court recently explained, the term "remaining assets," to which shareholders are entitled pursuant to §281(b), can be understood only in relation to such a plan of distribution:

*A determination of the "remaining assets" that can be distributed to shareholders must be based on the distributable assets that exist, and on the dissolving corporation's estimates of the value of pending and future claims, at the time the plan of distribution is adopted.* If the assets set aside to provide for pending claims and for claims likely to arise within ten years after dissolution exceed the value of the claims actually brought within that period, the dissolved corporation will continue to have net assets on the tenth anniversary of its dissolution. Moreover, even after any initial distribution to shareholders, the dissolved corporation could continue to hold any contingent assets that would vest thereafter to satisfy creditor claims. There is no statutory requirement that the dissolved corporation must distribute to shareholders all assets that remain after any initial asset distribution to creditors or shareholders.

*In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 708 (Del. 2013) (emphasis added). Put otherwise, ownership of the assets of a dissolved corporation do not devolve onto shareholders by operation of law immediately upon the filing of a certificate of dissolution; they have to be distributed according to a plan.

So AVC's assets did not automatically revert to Epogy, its 100% owner, when it filed its certificate of dissolution on November 1, 2002. AVT cites no authority for the proposition that title to AVC's assets devolved onto its 100% shareholder by operation of law immediately upon the filing of a certificate of dissolution except §281(b), and §281(b) does not so provide.

And therein lies the rub.

AVT offers no evidence that either AVC or Epogy ever adopted the statutorily required plan of distribution. The only fair inference from the evidence it does offer (about which more below) is that no such plan was adopted. It is, therefore, impossible to conclude that Epogy

18

acquired title to AVC's assets, at the very least during the three year statutory "wind-down" period provided for in § 278, and perhaps for an even longer period. §281(b) requires a dissolving corporation to adopt a plan of distribution, and gives it a period of time -- the three year statutory wind-down period – to do so. It thus stands to reason that the dissolving corporation retains title to its assets until such a plan is adopted, so that it can use those assets to satisfy any obligations that exist on the date of dissolution.

Of course, AVC may not have had any obligations or pending claims to settle on the day it filed its Certificate of Dissolution; if so, a plan of dissolution, duly adopted by AVC's Board, could undoubtedly have provided for a prompt distribution of some or all of AVC's assets, including its interest in the '788 patent. But even on that assumption (and there is absolutely no evidence in the record on the point), AVC and its parent Epogy still had to comply with the statutory formality: AVC had to adopt a plan of distribution, and AVC had to "distribute" the assets to Epogy for its parent to obtain ownership of its subsidiary's assets. Defendants have scoured the filings in the office of the Delaware Secretary of State and have come up with AVC's Certificate of Incorporation, its Amended and Restated Certificate of Incorporation, and its Certificate of Dissolution – but no plan of distribution, or any evidence that one was ever adopted. None was produced during discovery. And none was produced by AVT in its opposition to the motion to dismiss.

In the absence of a plan, there could have been no distribution on or about November 1, 2002, the date of AVC's dissolution. And in the absence of a distribution, AVC's assets, including the '788 patent, were not acquired by AVC's parent corporation, Epogy on November 1, 2002 – or at any time during at least the statutory wind-down period provided for in §278.

19

This is critically important, because Epogy purported to assign its interest in the '788 patent to Gordon on January 15, 2013. In the absence of a distribution pursuant to a plan, as mandated by §281(b), Epogy had no ownership interest in the patent on that date. AVT suggests no reason why AVC's rights in the '788 patent would, could or should have devolved by operation of law onto its shareholder/parent a mere two and one half months after the filing of the certificate of dissolution, except via a plan of distribution that does not appear to exist. The logic of the § 278 period of continued corporate existence, as well as the fact that §281(b) mandates the creation of a plan of distribution, suggests otherwise. Indeed, were that not the case, shareholders of a Delaware corporation could simply assume ownership of assets needed for other purposes. But they are not statutorily entitled to such assets.

In short, under no reading of §281(b) could Epogy have acquired title to the patent pursuant to that statute before January 15, 2003, the date when it purported to assign its rights to Gross. Which means, perforce, that Epogy conveyed to Gross nothing at all – and Gross conveyed nothing at all to Plaintiff.

With no assignment and no statutory mechanism to support a transfer of AVC's patent rights to Epogy by the magic January 15, 2003 date, AVT is left to argue that AVC must have transferred its interest to Epogy simply because it *intended* to do so – and because it represented to Gross that it had done so. Thus, AVT has submitted[3] a declaration by Mr. Peter Courture, an attorney who served as Epogy's incorporator, Secretary and Director back in 2000, when the

---

[3] Defendants complain that this declaration was only submitted in response to the present motion, after the close of discovery. Plaintiff AVT responds that Defendants did not raise the issue of AVT's ownership of the '788 Patent until after the close of discovery. The court really does not care, because the affidavit establishes no legal transfer.

20

Purchase Offer Agreement was executed. (*See* Docket #207 at ¶ 2.) At some unspecified point in time, he also served as AVC's secretary and agent for service of process. (*Id.*) He recollects that:

> Subsequent and pursuant to the entry into the [Purchase Offer Agreement] . . . Epogy made offers to acquire 100% of the outstanding stock of AVC and I believe those offers were accepted . . .
>
> It is my further recollection . . . [and on the basis of my dealings and interactions with Epogy, AVC and other stakeholders] . . . that Epogy *was intended to succeed to ownership of all patents of AVC* and that the recordation of the Purchase Offer Agreement with the USPTO was intended to reflect Epogy's ownership of these patents.

(*Id.* at ¶ 3-4 (emphasis added).) AVT also offers the deposition testimony of Homer Chang, who was "at all pertinent times the CEO and Co-Chair of Epogy." (Docket #106 at 25), and who testified that Epogy

> purchased AVC. I don't remember the details [of events that occurred 12 years before the deposition], but yes, we did purchase AVC . . . We did acquire – you know, fold under – Epogy under – AVC under Epogy . . . AVC became – equipment, everything was owned by – or acquired by Epogy . . . any technology, personnel, you know, pretty much, you know, acquired AVC.

(Docket # 106 at 26-27) (quoting Chang Dep. at 17:3-7, 18:18-19:18, 20:6-12, 20:24-21:18, 30:12-17).[4] Moreover, in its April 21, 2015 letter to the Court, AVT points to Mr. Gross' recent (April 2, 2015) deposition, in which he testified that, "the board of directors and the people who did the deal with AVC . . . affirm[ed] and warrant[ed] that they had title to the assets." (*See* Docket #163, AVT Letter of Apr. 21, 2015 at 2) (citing Gross Dep. at 290).

Finally, AVT points to the fact that Epogy executed two documents on behalf of AVC after it acquired AVC's stock. One is a September 2000 "Statement by a Foreign Corporation" that Epogy executed "on behalf of" AVC. The other is a January 2002 Delaware tax filing that Homer Chang of Epogy signed as AVC's "Chairman and CEO."

---

[4] The "we" Mr. Chang was referring to included Epogy's only other officer, co-inventor Woo.

Clearly, Epogy's officers (including Woo, who had been the principal of AVC) believed that they had transferred patent rights from one entity to the other. But believing does not make it so. Similarly, warranting to Gross that Epogy had valid title to the patent does not make it so. I could warrant that I had title to the Brooklyn Bridge, but that would not make me the bridge's owner; it would only give the person to whom I sold it an action for breach of warranty. So to here: Gross could sue Epogy for breach of warranty (were the claim not time barred), but Epogy plainly erred when it told Gross that Epogy had valid title to AVC's assets, because those assets had been neither assigned nor distributed to it. A misstatement about what one owns does not convey any interest in the disputed property.

Similarly, the recordation of the AVC-Epogy Purchase Offer Agreement with the USPTO, about which Couture testifies, did not transfer AVC's ownership interest in the '788 patent; it merely announced AVC's and Epogy's intention that those rights would be transferred. The public filings in which Epogy's chairman signed on behalf of AVC did not effect a transfer; I have little doubt that Epogy's chairman was also the chairman of its wholly-owned subsidiary (that is generally the way it works), but that proves nothing about the ownership of AVC's assets. And while Mr. Courture's declaration, as well as the express terms of the Purchase Offer Agreement, express what the parties intended -- namely, that Epogy would succeed to AVC's rights in the '788 patent -- intentions that do not crystallize into acts recognized by law as sufficient to transfer title do not convey title.

In short, between 2000 and January 15, 2003, Epogy and its lawyers somehow managed to do everything except actually convey title to the patent from subsidiary (AVC) to parent (Epogy). Therefore, under Delaware law, AVC (not Epogy) owned the patent on the day Epogy (not AVC) purported to convey the patent to Gross, AVT's predecessor-in-title.

22

I find instructive the recent opinion in *Labyrinth Optical Technologies, LLC v. Alcatel-Lucent USA, Inc.*, 12-00759 (C.D. Cal. Mar. 23, 2015) (on file with the Court). In that case, the plaintiff's claim to own the relevant patent rested on a written assignment that purported to assign all the patents "listed in the Exhibit attached hereto." Unfortunately, no such exhibit was appended to the assignment. The *Labyrinth* court found it "likely that the parties intended to include a list of transferred patents in the Exhibit, but they did not." *Id.* at 8. Under the relevant state law, the absence of any document showing precisely what was to be conveyed defeated the plaintiff's claim to title and thus required dismissal for lack of subject matter jurisdiction. Indeed, the *Labyrinth* court dismissed *even though* the plaintiff represented that it could simply have another, corrected assignment executed and refile the very same action.

Here, in order for AVT to acquire rights in the '788 patent, it would have to take an assignment from Epogy (which now most likely does own the patent, or at least a two-thirds interest in it – although it would be well advised to consult a lawyer well-schooled in Delaware corporate law). But standing is determined as of the date a lawsuit is filed, and these lawsuits were filed three and four years ago. An assignment today cannot save these cases from dismissal.

## IV. AVT's Suggestion That This Matter Be Heard by a Jury is Rejected

Finally, there is no merit to AVT's suggestion that the Court refer any factual disputes over its ownership of some interest in the patent to a jury – both because a district court is permitted to resolve factual disputes when ascertaining its own jurisdiction (see supra., at page 8), and because the record raises no genuine issues of material fact to resolve.

"As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs*, 307 U.S. at 71–72. Where a *genuine* issue of *material* fact exists relating to subject matter jurisdiction, it is within the court's discretion to hold a hearing limited to the question of Article III standing. *Alliance For Envtl. Renewal, Inc. v.*

23

*Pyramid Crossgates Co.*, 436 F.3d at 87-88. But AVT has not produced any evidence sufficient to create a genuine issue of material fact as to the dispositive question here: whether AVC transferred its interest in the '788 Patent to Epogy, its sole shareholder, before January 15, 2003, when Epogy purported to transfer that interest to Gross, who in turn purported to transfer it to Plaintiff. Had AVT provided a copy of its plan of distribution for AVC, or even testimony that such a plan was adopted and made provision for the immediate transfer of the patent rights, that might have raised a genuine issue of fact. Had AVT provided a written assignment, or even testimony that one was made but cannot now be located, that could have raised a question of fact. Going back to its original position, had AVT provided any evidence that the two corporations were merged, that would have raised a genuine issue of fact.

But AVT has done none of these things. It has merely provided a declaration from an attorney who recalls what was intended but evidently never done, and from the President of Epogy, who apparently believed that a merger took place when none ever did. This "evidence" falls far short of creating a genuine dispute as to any fact that would be *material* to resolving whether Epogy took title to the patent pursuant to a "distribution of [AVC's] remaining assets" under Del. Code. Ann. tit. 8, § 281(b) before it purported to assign its interest in the patent on January 15, 2003.

Because AVT raises no genuine issue of material fact, there is no need to conduct any hearing at all – let alone impanel a jury to deliver what would be a wholly advisory verdict. Rather, I proceed in a manner the Second Circuit has recognized as appropriate: after discovery concerning the jurisdictional issue (which was conducted in the course of more fulsome discovery proceedings already underway in these matters), and on a motion supported by affidavits and exhibits – including an affidavit that AVT submitted specifically to aid the Court in its resolution of the issue

24

of subject matter jurisdiction. *Alliance For Envtl. Renewal, Inc.*, 436 F.3d at 87-88 (citing *Exchange National Bank.*, 544 F.2d at 1131).

## CONCLUSION

For the foregoing reasons, Defendants' joint motion is GRANTED and actions 11 Civ. 06604, 11 Civ. 08908, and 12 Civ. 00918 are DISMISSED. The Clerk of the Court is directed to remove Docket No. 100 in the 11 Civ. 06604 action, Docket No. 81 in the 11 Civ. 08908 action, and Docket No. 91 in the 12 Civ. 00918 action, from the Court's list of pending motions and to close the file in each action.

Dated: April 28, 2015

U.S.D.J.

BY ECF TO ALL COUNSEL

25